IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2007 AUG 15 P 1: 37

CLERK J. Britton

THERESA EDWARDS and HARVEY       *
EDWARDS, individually and as     *
Next Friends of KAYLA EDWARDS,   *
a minor, and SHERRY BURROW and   *
DAVID BURROW as Next Friends of  *
JESSICA BURROW, a minor,         *
                                 *
        Plaintiffs,              *
                                 *   CIVIL ACTION NO.
v.                               *   CV 104-168
                                 *
COUNTY BOARD OF EDUCATION        *
OF RICHMOND COUNTY, and MACON    *
WARREN, DR. LYNN DUNCAN,         *
ANNETTA WILLIAMS, AND KELLY      *
TOWNS, all in their individual   *
capacities,                      *
                                 *
        Defendants.              *

_____

O R D E R
_____

        Before the Court in the captioned case is Defendants'
motion for summary judgment on all of Plaintiffs' claims.
Oral argument on the motion was heard on March 14, 2007.
Based upon the briefs and argument of counsel, the record
evidence, and the relevant law, Defendants' motion for summary
judgment is **GRANTED.**

I.   BACKGROUND

        The relevant facts of this case begin with the enrollment
of two five-year old children, Kayla Edwards and Jessica

Burrow, into a special education class at Harlem Elementary School ("HES") during the first portion of the 2003-2004 school year. (Defs.' St. of Undisputed Facts, ¶¶ 1 & 2.) Defendant Annetta Williams served as the special education teacher. (Id. ¶ 5.) Defendant Kelly Towns was a teacher's aide who served in the classroom. (Id. ¶ 6.) During the relevant time period, Defendant Dr. Lynn Duncan was the principal of HES, and Defendant Macon Williams was a school counselor. (Id. ¶¶ 3 & 4.) These Defendants were employed by the County Board of Education of Richmond County ("School Board"), also a defendant in the case.

Plaintiffs Sherry Burrow and David Burrow are the parents of Jessica Burrow. Plaintiffs Theresa Edwards and Harvey Edwards are the guardians of Kayla Edwards. Harvey Edwards is Kayla's grandfather and the father of Kayla's biological mother, Letha Pearl Edwards. (Th. Edwards Dep. at 10, 19.) Theresa Edwards is Kayla's grandmother (and the stepmother of Kayla's biological mother).[1] (Id. at 18.) Letha Pearl Edwards does not reside in the household. (Id. at 33.)

Kayla resides with Plaintiffs Harvey and Theresa Edwards and five other children. According to Mrs. Edwards, all six children suffer from various medical conditions, and at least four of the five children have a history of physical or sexual

---

[1] Harvey and Theresa Edwards will be referred to as Kayla's parents herein.

abuse.[2]  Kayla's biological mother, Letha Pearl Edwards, has

allegedly abused two of the children in the past, including

Kayla.[3]  All of the children, except the oldest, have been

home-schooled.[4]

    At HES, both Kayla Edwards and Jessica Burrow were placed

in Ms. Williams' pre-kindergarten "SDD" (significantly

developmentally delayed) class.  (Williams Dep. at 14-15.)

---

    [2]  Mrs. Edwards described her children as follows:

    Lillian: She is Mrs. Edwards' step-daughter.  Lillian and Letha
Pearl have the same mother, who was Harvey Edwards' second wife.  (Th.
Edwards Dep. at 18-19; H. Edwards Dep. at 7.)  In 2005, Lillian was
twenty-one years old (Th. Edwards Dep. at 503), but she had the
intelligence of a nine-year-old (H. Edwards Dep. at 93).  When she was
only eight months old, Lillian suffered a depressed skull fracture at
the hands of her biological mother.  She contracted viral encephalitis
thereafter.  (Th. Edwards Dep. at 23.)  Lillian was also physically
abused by her older sister, Letha Pearl.  (Id. at 26.)  Lillian has
ADHD (attention deficit hyperactive disorder) and is deaf in one ear.
(Id. at 40, 42.)

    Malek and Nohemi: They are the biological sons of Harvey and
Theresa Edwards.  (Id. at 11-12.)  At the time of the relevant events
in this case, Malek was 15 and Nohemi was 13.  Malek was sexually
molested and abused by Letha Pearl when he was only five years old.
(Id. at 30-31.)  Malek suffers from ADHD, dyslexia, and hypoglycemia.
(Id. at 41.)  Nohemi suffers from ADD (attention deficit disorder),
epilepsy, and asthma.  (Id. at 42.)

    Briana and Brakeya: These girls are Kayla's younger sisters.
They have the same birth mother, Letha Pearl.  (Id. at 20-21.)  Mrs.
Edwards believes that Briana was sexually assaulted by Letha Pearl's
boyfriend.  (Id. at 36.)  She has no proof that Brakeya was ever
abused.  (Id. at 37.)  Both Briana and Brakeya suffer from ADHD.  (Id.
at 42.)

    [3]  Kayla was allegedly burned with a cigarette and struck across
her back at three and a half weeks old.  (Th. Edwards Dep. at 34.)
Mrs. Edwards does not believe that the abuse Kayla suffered caused any
of her current health conditions.  (Id. at 58.)

    [4]  Kayla was withdrawn from HES in October of 2003 and has not
returned to public school.  (Th. Edwards Dep. at 95.)  Malek was
withdrawn from public school in the eighth grade (id. at 517), and
Nohemi was withdrawn in the first grade (id. at 520).

The students in this class have diverse and challenging needs. For instance, in Ms. Williams' special education class of 2003-2004, two of the children had the medical diagnosis of autism; one child was designated as "NOS" (non-specific pervasive disorder); one child had Down's Syndrome; one child was hearing impaired; and one child suffered from shaken baby syndrome. (Id. at 16.)

The door to Ms. Williams' special education classroom was always unlocked and could only be locked from the outside. (Williams Aff. ¶ 22 & Exs. A & B.) The classroom was always open to parents, other teachers and students, and other HES staff members. Indeed, parents frequently entered the classroom throughout the school day. The classroom had a bathroom which was used on a regular basis by other students from other classes. (Warren Dep. at 95-96.)

Pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq., each public school child who receives special education and related services must have an Individualized Education Program or "IEP." Id. § 1414. The child receives an evaluation annually from his or her IEP team, which includes teachers, counselors, the child's parents, and other school service providers. The IEP team confers and develops an educational plan to improve results and to insure educational success for the disabled student. Throughout the school year, a parent may request an IEP

4

meeting to review the student's progress or to request changes. Id.

The record does not contain an IEP for Jessica Burrow. According to the school psychologist, Jessica Burrow has significant developmental delays in the following areas: "Social-Emotional, Communication, Motor, Adaptive, and Cognition." (Pls.' Ex. 28, Report of Dr. Carolyn Paul.) She has medical diagnoses of autism and petit mal seizures. In addition, she has a "profound receptive language disorder, profound expressive language disorder, and profound articulation disorder." Nevertheless, Jessica is cooperative, eager to learn, and would benefit from a program that provides positive support.[5] (Id.)

Kayla Edwards' diagnoses, particularly whether she is autistic, are less clear. During her IEP meeting in May of 2003, a letter was presented from her treating psychiatrist, Dr. Elizabeth Sundee, that diagnosed Kayla with pervasive developmental disorder not otherwise specified ("PDD NOS"). (See Pls.' Ex. 23.) According to Dr. Sundee, Kayla was in need of a special education classroom with few students and a low level of activity. (Id.) At that time, the IEP team recommended that Kayla spend half of her day in a regular

---

[5]    Mrs. Burrow describes Jessica as autistic and mildly intellectually disabled. (S. Burrow Dep. at 13.) Jessica also has sensory deprivation disorder, profound language delay, low muscle tone and allergies. (Id.)

classroom. (Warren Dep. at 53.)

During an IEP meeting on August 7, 2003, right before the first day of school, Mrs. Edwards expressed her concern with Kayla's placement. (See Pls.' Ex. 17.) Kayla thus was not placed in a regular classroom half of the time. Additionally, psychological testing to determine Kayla's eligibility for autism placement was recommended, but Mrs. Edwards insisted on using her own private psychologist, Dr. John C. Whitley III. (See id.)

Pursuant to Dr. Whitley's report of August 15, 2003, Kayla was diagnosed with pervasive developmental disorder and ADHD. (Defs.' Ex. Y, Psychological Evaluation of Dr. John C. Whitley III, dated Aug. 15, 2003.) A pediatrician, Dr. Karen Carter, diagnosed Kayla with autism with attention deficits and hyperactivity. She also noted hypotonia, significant sensory integration issues, sleep disorder, strabismus, and precocious puberty. (Defs.' Ex. Y, Letter of Dr. Karen Carter, dated Oct. 30, 2003.) Despite these medical diagnoses, Defendants dispute that Kayla was autistic; in any event, Defendants did not find Kayla eligible for autistic programs.

While Kayla was enrolled at HES, Mrs. Edwards accompanied Kayla to class on a nearly daily basis and stayed with her for various lengths of time. (Th. Edwards Dep. at 208-09.) Mrs. Edwards would return to the school shortly before 12:00 noon

because she had to administer Kayla's medication at that time. Again, she stayed for various lengths of time, sometimes not leaving at all. (Id. at 209-10.) When Mrs. Edwards left, she returned to pick up Kayla around 2:00.[6] (Id. at 205.) It is apparent from the record that parents of Kayla's classmates were sometimes in the classroom also.

This case stems from the alleged mistreatment of Kayla and Jessica in the classroom of Defendants Williams and Towns and from the conflict between Kayla's parents and the school's personnel regarding this alleged mistreatment. Accordingly, Plaintiffs' claims either center on the alleged abuse of Kayla and Jessica or on the events that occurred after Kayla's parents complained of the abuse to HES and the School Board.

## A.    PLAINTIFFS' ALLEGATIONS OF ABUSE

In their complaint, Plaintiffs allege that Defendants Williams and/or Towns abused Kayla and Jessica while in the classroom. Specifically, Plaintiffs allege that the children suffered the following forms of abuse: (1) the infliction of bruises; (2) the denial of bathroom privileges; and (3) failure to accommodate the dietary needs of the children. (Compl. ¶¶ 27-36.)

---

[6] Mr. Harvey Edwards performed this duty for a one-week period (H. Edwards Dep. at 32-33), and at times, Mrs. Edwards' father would pick up Kayla for Mrs. Edwards or would accompany her to the school. (Th. Edwards Dep. at 204-05.)

*Kayla Edwards*

The allegations of abuse derive almost exclusively from the observations and beliefs of Plaintiff Theresa Edwards and the comments she heard from her small daughter. (See generally Th. Edwards Dep. at 488-89.) According to Mrs. Edwards, Kayla came home from school on four separate occasions with unexplained bruises on her arms. (Id. at 178, 334.) When Mrs. Edwards asked Kayla about the bruises, she would state that "Miss Towns hurts me." (Id. at 175.) While the specific dates of these alleged incidents is unknown, the first two events took place in mid to late August, during the first few weeks of school. (Id. at 334.) On several occasions, Mrs. Edwards asked Ms. Williams about the bruises, but no explanation was forthcoming. (Id. at 336.) Mrs. Edwards also claims to have verbally informed Dr. Duncan, the principal, and Ms. Warren, the school counselor, about the bruises at various times. (Id. at 336.) On the third occasion, in the first week of September, the way Kayla was holding her arm caused Mrs. Edwards to take her to the emergency room at Eisenhower Army Medical Center, at which time X-rays were allegedly taken.[7] (Id. at 230, 335.) On the fourth occasion

_____

[7] Mrs. Edwards claims that she shared the emergency room record of the visit with school officials (Th. Edwards Dep. at 231), but these records have not been produced in discovery and Defendants claim never to have seen them. (Pls.' Resp. to Defs.' St. of Uncontested Facts, ¶ 21.)

of bruising, Mrs. Edwards claims that she took Kayla to Dr. Duncan's office to show her the bruises, and Dr. Duncan dismissed them as birthmarks.[8] (Id. at 153, 335.)

In addition to the verbal complaints Mrs. Edwards made to Defendants Williams, Warren and Duncan, she claims to have delivered a complaint letter, dated September 22, 2003, to Dr. Duncan (Th. Edwards Aff. ¶ 19; see Duncan Dep., Ex. 1) and a complaint letter, dated October 23, 2003, to Dr. Missoura Ashe of the School Board (Th. Edwards Aff. ¶ 40). She claims to have delivered copies of these letters to Dr. Virginia Bradshaw of the School Board on October 31, 2003. (Id. ¶ 45.)

There are no eyewitnesses to events that may have caused the bruising on Kayla. (Pls.' Resp. to Defs.' St. of Uncontested Facts, ¶¶ 15, 17.) Rather, there are only the reports of Kayla to her family members.[9] Also, Tracey McClam, a friend and neighbor of the Edwards, saw the bruises on Kayla and was told by Kayla that her teacher did it, although she does not remember what name Kayla called. (McClam Dep. at 25, 33.)

---

[8] Defendants Williams, Duncan and Warren deny having any conversation with Mrs. Edwards about bruising on Kayla's arms or any other form of physical abuse. They claim not to have heard about these allegations related to Kayla until well after Kayla was withdrawn from school. (Warren Dep. at 31-32, 77; Williams Dep. at 26, 49; Duncan Dep. at 31-38.)

[9] In addition to Mrs. Edwards, Mr. Harvey Edwards and Malek and Nohemi Edwards claim to have seen bruises on Kayla's arms and to have heard her proclaim the teacher did it. (H. Edwards Dep. at 96-97; M. Edwards Dep. at 21-23; N. Edwards Dep. at 24.)

It should be noted that the record contains the affidavit of Ms. Leeann Zrakovi, a non-party and mother of one of Kayla's classmates, who avers that her daughter, Asha Houston, came home on numerous occasions with unexplained bruises and cuts. (Zrakovi Aff. ¶ 5.) She further claims that Asha once had blood in her hair and once had her lip cut open. (Id.) Ms. Zrakovi claims to have complained to Ms. Williams and Dr. Duncan about the bruises and cuts. (Id. ¶ 9.) Also, Plaintiff David Burrow testified that he witnessed Ms. Towns jerk on Asha Houston so hard that she caused the little girl to hit her head on the wall. (J. Burrow Dep. at 31; see also S. Burrow Dep. at 116; Shirey Dep. at 33-34; Th. Edwards Dep. at 170, 180-81, 184-85.)

On the other hand, the record contains numerous affidavits from parents, teachers, and others who aver that they never witnessed or had any knowledge that abuse ever occurred in Ms. Williams' classroom. (See Attwood Aff. ¶¶ 5-9; Bradford Aff. ¶¶ 5-9; Fogle Aff. ¶¶ 5-9; Griffin Aff. ¶¶ 5-9; Harkrider Aff. ¶¶ 5-9; Mayton Aff. ¶¶ 4-8; Parker Aff. ¶¶ 5-9; Sweat Aff. ¶¶ 4-8.)

In addition to the alleged physical abuse, Mrs. Edwards reports that Kayla was fully potty-trained when she was enrolled in Ms. Williams' class but that she regressed thereafter. (Th. Edwards Dep. at 194-95.) Specifically, Mrs. Edwards claims that Kayla had wet or soiled clothing almost

daily, either when she visited Kayla around noon or at the end of the school day. (Id. at 223-24.) Mrs. Edwards claims that she had to change Kayla's clothing frequently, and sometimes she had to take Kayla home, not to return, in order to give her a bath. (Id.) Mrs. Edwards claims to have seen other children in the classroom wet or soiled without any intervention or help from the teachers. (Id. at 174, 221-23.) She claims to have helped change the children's clothes. (Id.) When Mrs. Edwards asked Kayla about soiling herself, Kayla allegedly stated that the teachers do not let her go to the bathroom. (Id. at 217-18.) Mrs. Edwards claims to have seen bathroom privileges withheld from Jessica Burrow and other students, including a male classmate who wet his pants as he stood in the classroom. (Id. at 174, 218-22.)

Mr. Edwards testified that on one of his visits to the classroom, he witnessed Jessica Burrow ask to go to the bathroom and be denied. He said Mrs. Williams told her to "sit down and shut up." (H. Edwards Dep. at 43.) Additionally, Ms. Zrakovi averred that her child came home soiled and wet on numerous occasions. (Zrakovi Aff. ¶ 17.)

Kayla also allegedly told her mother that she was placed in a closet with a locked door when she was bad. She referred to this closet as the "jailroom." (Th. Edwards Dep. at 440.) No adults have seen children being placed in the closet, but Plaintiffs claim that Kayla, Jessica, and Asha Houston tell

11

the same story about the "jail room."  (Id. at 440-41; S. Burrow Dep. at 118; Zrakovi Aff. ¶ 21.)

Finally, Mrs. Edwards claims that HES refused to accommodate Kayla's sensory tactile disorder and her autistic tendencies.  For instance, Kayla required her food to be "mushy."  (Th. Edwards Dep. at 187-88.)  According to Mrs. Edwards, Kayla could not eat food with texture, and her food had to be overcooked and cut into very small pieces.  (Id.) She stated that she told HES about this requirement and that they were willing to accommodate her needs but only after a doctor's note.  Mrs. Edwards testified that she provided three prescriptions explaining the dietary requirements for Kayla, but that HES still failed to provide food to Kayla.  (Id. at 188-89, 446-49.)  She claims that Kayla complained of hunger during her school days and that she lost weight.  (Id. at 190, 193, 450.)  She claims that other parents called her to tell her Kayla was crying because she was hungry and that she was not given a food tray in the cafeteria.  (Id. at 190-92, 450-51.)  Other than Mrs. Burrow, no parent admits to having told Mrs. Edwards about this or ever seeing Kayla being deprived of food.[10]  Defendants claim that Kayla ate her lunch with the other students and was never deprived of food.  (See Williams

---

[10]  Mrs. Burrow witnessed Kayla cry for food on three occasions because she had been given solid food on her tray.  (S. Burrow Dep. at 110-13.)

12

Dep. at 40.)

Next, Mrs. Edwards claims that the school failed to notify her of fire and tornado drills ahead of time as she had requested. According to Mrs. Edwards, Kayla has more acute hearing than normal and loud noises cause her distress. (Id. at 458-59, 463.)

Also, Mrs. Edwards explained that Kayla needed to be "mushed." For this purpose, Mrs. Edwards brought in weighted lap belts to place across Kayla's legs and a large box for Kayla to climb into. Mrs. Edwards claims that the school failed to provide these items to Kayla. (Id. at 450-51, 463.)

### Jessica Burrow

Plaintiffs David and Sherry Burrow also claim that Jessica was abused in Ms. Williams' class. Mrs. Burrow claims that she spoke to Ms. Williams in August 2003 regarding Ms. Towns after she saw her jerk on the arms of Asha Houston. (S. Burrow Dep. at 79.) Mrs. Burrow also reportedly told Dr. Duncan about Ms. Towns' conduct in early September, and Dr. Duncan allegedly responded that Ms. Towns was "on notice." (Id. at 80.)

Mrs. Burrow hoped things would change, but in late October 2003, Jessica said, "Bad Jessica[,] Bad Jessica" while slapping herself on the cheek; Jessica told her mother that Ms. Towns had slapped her. (Id. at 150-51; see also J. Burrow Dep. at 103.) She discussed this with Ms. Williams the next

day and was told that Jessica must have misunderstood the situation. (S. Burrow Dep. at 147.) At the end of October, Ms. Williams allegedly told Mrs. Burrow that the School Board was going to remove Ms. Towns from the class. (Id. at 153.) On November 23, 2003, Mrs. Burrow purportedly sent a letter to HES complaining of the perceived abuse of Jessica.[11] (See Pls.' Ex. 28; S. Burrow Aff. ¶ 7.)

The Burrows claim that they found small "fingerprint" bruises on the arms of Jessica on December 3, 2003. (S. Burrow Dep. at 81, 155.) When Mrs. Burrow had lifted Jessica on that day, Jessica cried out, "Ow. Kelly hurt arm." (Id. at 155.) Ms. Holly Hadden, a special education teacher for the School Board, saw the bruises on Jessica and heard Jessica say that Ms. Towns hurt her. (Hadden Dep. at 39-40.)

Mrs. Burrow filed a police report concerning the incident (Dobyns Dep., Ex. 1) and contacted Dr. Virginia Bradshaw of the School Board (S. Burrow Dep. at 81, 158). She also faxed a "Letter of Complaint" to Dr. Duncan the next day. (Pls.' Ex. 28.)

On December 5, 2003, Mrs. Burrow and her oldest daughter,

---

[11] In her deposition, Mrs. Burrow stated that she found bruises on Jessica on four occasions. (S. Burrow Dep. at 141.) On the first occasion, Jessica had a bruise on her knee; Mrs. Burrow was told that she had fallen from the sliding board. (Id. at 141-42). On another occasion regarding a bruise to her temple, Jessica had been accidentally struck with an E-Z Bake Oven during a tussle between another child and a teacher. (Id. at 142-44). Mrs. Edwards apparently witnessed this event. (Th. Edwards Dep. at 212-14.)

Mr. Burrow testified that he saw bruises on Jessica's arm on three occasions. (J. Burrow Dep. at 36-37.)

14

Ms. Jennifer Shirey, met with Dr. Duncan. (S. Burrow Dep. at 160.) Mrs. Burrow claims Dr. Duncan threatened her during this conversation by telling her to be "very sure of what [she] wanted to start before [she] started it" and that the school would be on the defensive. (Id. at 82, 212.) Dr. Duncan allegedly referred to "other parents" who had made complaints during the conversation.[12] (Id. at 213.)

On December 8, 2003, Mrs. Burrow sent a letter to HES

---

[12] Mrs. Burrow covertly tape-recorded the conversation with Dr. Duncan. (Shirey Dep. at 48-49.) The transcript of the recording reveals that it was largely unintelligible, and the Court could find no reference to "other parents" as intimated by Mrs. Burrow. (See Pls.' Ex. 16.) Dr. Duncan states in the transcript as follows:

> I just want to be sure that what you want to accuse an adult in this school of you - - you are sure of yourself, not from what someone else has told you . . . . But I think that [unintelligible] has a love and a heart for these children and [unintelligible] and bring her in here and accuse her of being abusive I will [unintelligible]. But I want to be careful. I mean, I think [unintelligible] and I don't want to do it flippantly. You know, if I have to, I will.

(Id. at 2 & 5.) Later in the conversation, the following colloquy takes place:

> DR. LYNN DUNCAN: [unintelligible] be sure you want to do this. It will be on [unintelligible].
>
> FEMALE VOICE1 (presumably Mrs. Burrow): [unintelligible]
>
> DR. LYNN DUNCAN: Why is that not okay [unintelligible]? I understand you have [unintelligible] children. [unintelligible] children under my care [unintelligible] for me as an adult [unintelligible] parents of our children who come to school here every day would think that we might allow our children to be harmed. Why would that not be my reaction? I would think you would be concerned if I was not reacting strongly.
> FEMALE VOICE1: [unintelligible]
>
> DR. LYNN DUNCAN: I have not said to you I'm not going to do anything about it. I have not said anything negative in any way, that we will pursue this. I have promised you that. . . .

(Id. at 6-7.)

(addressed "To Whom It May Concern") stating: "Due to abusive conditions within Hephzibah Elementary School, I will be temporarily home schooling my daughter Jessica Burrow." (Pls.' Ex. 28.)

A School Board investigation was immediately opened on Mrs. Burrow's complaint, and a School Board investigator, Ms. Troi Dobyns, was assigned to the case. (Dobyns Dep. at 18-19.) Ms. Dobyns was told by the adults in Jessica's special education classroom that, although they could not remember precisely what had caused the bruises, Jessica suffered from seizures and had fallen from her chair while eating lunch.[13] (Pls.' Ex. 28.) The case was closed on February 10, 2004, after Ms. Dobyns could find no evidence to link Ms. Towns to the bruises on Jessica. (Dobyns Dep. at 27, 35.)

As with Kayla, Jessica's claims of abuse include the use of the "jail room" and the denial of bathroom privileges.[14] Finally, Mrs. Burrow claims that Jessica was allowed to eat things that were not in her special dietary plan. (S. Burrow Dep. at 124-26, 136-37.)

---

[13] Mrs. Burrow stated in an affidavit that Jessica does not have any seizure activity and that this was confirmed by medical professionals who ran EEG tests on her. (S. Burrow Aff. ¶ 9.)

[14] Mrs. Burrow testified that Jessica came home wet or soiled on numerous occasions despite Jessica having been fully potty-trained before her attendance at HES. (S. Burrow Dep. at 88-93, 96). She also testified that she witnessed another child in the classroom soiled on five separate occasions. (Id. at 108-09.)

## B. PLAINTIFFS' ABUSE-RELATED CLAIMS

As a result of the factual allegations set forth above, Plaintiffs have brought several claims related to the alleged abuse occasioned upon Kayla and Jessica.[15] The following state law claims are brought on behalf of Kayla and Jessica by their parents: battery and assault against the School Board, Annetta Williams and Kelly Towns (Counts 1, 2, 24 and 25); and intentional and negligent infliction of emotional distress against all defendants (Counts 3, 4, 26 and 27). The parents also brought the following claims pursuant to 42 U.S.C. § 1983 on behalf of their children: in Counts 13 and 28, against all defendants except Defendant Warren, the parents allege a violation of their children's Fourteenth Amendment right to be free from unreasonable, arbitrary and capricious disciplinary action; and in Counts 20 and 29, against all defendants, the parents allege a violation of their children's Fourteenth Amendment right to "bodily integrity" as protected by substantive due process.

Factually, Defendants deny all allegations of abuse of any student in Ms. Williams' classroom. They contend that bruises these children may have received, if any, were the

---

[15] At oral argument, counsel for Plaintiffs conceded that the counts discussed herein are the "abuse-related" claims. Moreover, on March 5, 2007, this Court enumerated the remaining claims in the case. The Court provided a chart, which, with respect to each claim, sets forth the name of the plaintiff(s) asserting the claim and the defendant(s) against whom the claim is brought. No party disputed the Court's summation of the remaining claims.

result of accidents or mishaps on the part of the children. They contend that there is no evidence except the word of two five-year-old autistic children and their self-serving parents to establish any link between the alleged injuries and Defendants Williams and Towns.

## C.   PLAINTIFFS HARVEY AND THERESA EDWARDS' ALLEGATIONS OF RETALIATION AND CONSPIRACY

At the beginning of the 2003-04 school year, Kayla missed nine days of school. (Th. Edwards Dep. at 271.) According to Mrs. Edwards, Kayla missed school for various reasons including doctor's appointments. (Id.) Mrs. Edwards claims to have submitted doctor's excuses to Kayla's teacher, Ms. Williams, for six of the absences. (Id. at 274.) Once a child has five absences, whether excused or unexcused, the school counselor prepares a referral form for the school social worker.[16] (Warren Dep. at 36-37.) In this case, the school counselor, Defendant Warren, prepared a referral form for Kayla Edwards based upon her absences, which the Court will refer to as the truancy report.[17] Ms. Warren testified

---

[16]   Defendant Warren states that she had received a letter from the school superintendent requesting that absenteeism be strictly enforced and addressed as a result of the No Child Left Behind Act of 2001. (Warren Dep. at 36-37.)

[17]   It is unclear from the record whether Ms. Warren saw any written excuses for Kayla before filing the truancy report. Indeed, Mrs. Edwards was unable to say whether Ms. Warren had received copies of the excuses that she had taken to the school. (Th. Edwards Dep. at 275.) In any event, Ms. Warren testified that whether the absences

that Mrs. Edwards later confronted her about the truancy report and provided copies of the excuses regarding some of Kayla's absences. (Id. at 38-40.)

In October of 2003, Mrs. Edwards requested an eligibility meeting with the special education program to determine whether Kayla was eligible for autism services. (Id. at 20-21.) On October 15, 2003, Ms. Melinda Lazenby, the Richmond County Autism Inclusion Facilitator, observed Kayla for several hours during the week prior to the meeting and recorded her observations. (Lazenby Dep. at 13-14.) In the report, Ms. Lazenby concluded that "Kayla's motor and communication skills are age appropriate. She responds to adult praise, expresses enthusiasm for work or play. She speaks positively about herself. She can attend to an activity, match shapes, and identify familiar objects by use. Records indicate that Kayla has a difficult time waiting her turn for attention, taking turns, sharing, and playing with peers."[18] (Id., Ex. 1.)

The eligibility meeting was conducted at HES on October

---

were excused or unexcused, she still had to submit the form. (Warren Dep. at 37.)

[18] The report further stated that Kayla demonstrates good eye contact, makes spontaneous initiations with peers and adults, responds to peers and adults, does not play alone, has imaginative play, has reciprocity, uses complex speech, demonstrates an appropriate vocal tone, can have conversations/social chat, displays no unusual preoccupations, and demonstrates no hand-flapping, repetitive use of objects, rocking or self-injurious behavior. (Lazenby Dep., Ex. 1.)

21, 2003.  Those people present included Mrs. Edwards, Dr. Duncan, Ms. Williams, Ms. Warren, Ms. Melinda Lazenby (autism inclusion facilitator), Ms. Rashann Parker (a regular education teacher), Ms. Angie Hopkins (a speech pathologist), Ms. Kelly Laird (an occupational therapist), and Ms. Harriett Godbee (a pre-school special education teacher).  (Id. at 49, 122-23.)  The group discussed Ms. Lazenby's report, the letter from Dr. Karen Carter, and the psychological report of Dr. Whitley. (Warren Dep. at 22, 45-46.)  Ms. Warren testified that HES was concerned about two factual inaccuracies in the Whitley report: (1) it states that Kayla was in an autism class at HES, and (2) it states that the psychological evaluation was required by HES.  (Id. at 51-52.)

Also during the meeting, Mrs. Edwards talked freely about Kayla.  She included information that Kayla liked to drink lemon juice and vinegar.  (Id. at 29.)  She reported that Kayla liked to be "mushed," meaning held tightly.  She reported that Kayla liked to be spun around.  As Mrs. Edwards talked, the group became concerned that Mrs. Edwards was attributing tendencies that Kayla did not display in the classroom.  At some point, the issue of why Mrs. Edwards would not allow school personnel to give Kayla her medication was broached.  Mrs. Edwards claimed that Kayla would "cheek" the medicine and not swallow it.  (Id. at 30-31.)  To demonstrate, Mrs. Edwards called for Kayla to be brought in, whereupon she

squeezed Kayla's cheeks to force her mouth open and yelled at Kayla over and over not to cheek the medicine. (Id.; Williams Dep. at 92-93.) At the conclusion of the meeting, it was determined that Kayla was not eligible for autism programs because she did not meet state requirements and there was insufficient information on file.[19] (Warren Dep. at 46-47; see also Lazenby Dep. at 24-25.)

After Mrs. Edwards left the meeting, some of the attendees discussed what they had just seen and heard. (Warren Dep. at 49; Williams Dep. at 93-94; Duncan Dep. at 47.) Ms. Warren reports that they were concerned about the following:

(1) The provision of lemon juice and vinegar to Kayla to drink;

(2) The report prepared by Dr. Whitley contained inaccurate information and referred to autistic behaviors that had not been observed at school;

(3) Mrs. Edwards would lay on top of Kayla while in Ms. Williams' classroom.[20] In addition, Mrs. Edwards would put

---

[19] According to Ms. Williams, Kayla returned to school for one day after the October 21, 2003 meeting, but Mrs. Edwards told her at that time that she was withdrawing Kayla and would be filing a complaint about the denial of Kayla's civil rights, referring to the county's refusal to find her eligible for autism services. (Williams Dep. at 65, 96-97.)

[20] Ms. Warren testified that the group that stayed over specifically discussed a recent news report about a North Carolina child's suffocation due to a pastor laying on top of him. (Warren Dep. at 92-93.)

Kayla in a chair and spin her. She also brought a vacuum cleaner box to school and told Kayla to get into the box. Ms. Warren reports that Mrs. Edwards stated the box was used to help Kayla deal with abuse issues, yet Kayla never requested to sit in the box until prompted by Mrs. Edwards;

(4) Ms. Edwards' insistence that Kayla's verbal abilities were significantly lower than what had been observed at school; and

(5) The harsh manner in which Mrs. Edwards provided the medication to Kayla at the meeting. (Warren Dep. at 50-51, 57-58, 85-87, 90-91; see Williams Dep. at 96.)

The group ultimately discussed whether a report should be made to the Department of Family and Children Services ("DFACS") because they were unsure about whether Mrs. Edwards was abusing Kayla. (Warren Dep. at 49-50.)

The same day of the eligibility meeting, Ms. Warren called Dr. Whitley's office to ask how to correct the factual inaccuracies in Kayla's psychological report since it was going to be part of Kayla's permanent record. (Id. at 51-54.) Ms. Warren also called DFACS to determine whether a report should be filed. The DFACS intake supervisor, Ms. Pat Crawford, told Ms. Warren to fax information regarding Kayla to her in order to make the determination. (Id. at 56-57, 81-82.) On October 23, 2003, Ms. Warren faxed Ms. Lazenby's observation report, Dr. Whitley's report, letters from Kayla's

22

other doctors, and the Richmond County autism eligibility determination. (Id. at 59-60, 64.) After reviewing the information, Pat Crawford called Ms. Warren that same day and instructed her to file a report. Ms. Warren prepared a DFACS referral form and sent copies of the referral form to the superintendent of schools and the Board attorney. (Id. at 60, 82-83.)

As it turns out, Ms. Warren filed the DFACS report on the same day that she had an exchange with Mrs. Edwards in the school's office - October 23, 2003. On that day, Mrs. Edwards confronted Ms. Warren about her call to Dr. Whitley's office and insisted that Ms. Warren sign a letter stating that she would not seek release of medical information again. (Warren Dep. at 55-56.) Ms. Warren signed the letter but told Mrs. Edwards that she would seek any information she deemed necessary if she felt Kayla was endangered.[21] (Id. at 56.)

The DFACS investigation was conducted by Tonia Miller. Ms. Miller reviewed the October 23, 2003 initial intake form and called Ms. Warren the next day. (Miller Dep. at 20, 23.) Ms. Warren requested to meet with Ms. Miller prior to any contact with the Edwards family. On October 29, 2003, Ms. Miller met with Ms. Williams and Ms. Warren at HES. (Id. at

---

[21] Also on October 23, 2003, Mrs. Edwards purportedly delivered a letter of complaint to Dr. Missoura Ashe at the School Board. (Th. Edwards Aff. ¶ 40.)

22-24.) At that time, Ms. Williams told Ms. Miller that she had concerns about Mrs. Edwards home schooling Kayla. She told Ms. Miller that she thought Mrs. Edwards stages things for Kayla and that Kayla is not the same person when Mrs. Edwards is around. Finally, Ms. Williams related that days earlier, Mrs. Edwards had fed Kayla a stick of butter.[22] (Id. at 30-31 & Ex. 1 - Child Protective Services Investigative Conclusion.)

After this meeting, Ms. Miller called Mrs. Edwards and asked her to bring the children to the DFACS office. Mrs. Edwards refused and told Ms. Miller that she was instead free to visit their home. (Id. at 60.) On October 30, 2003, Ms. Miller, unaccompanied, visited the Edwards home and talked with Mrs. Edwards and Mrs. Edward's father. (Id. at 25-26.) Mr. Harvey Edwards was not present.[23] Ms. Miller testified that Mrs. Edwards would not let her speak to any of the children alone. (Id. at 43-44.) During this visit, Ms. Miller spoke with Dr. Susan Carter on the telephone, who told

---

[22] The Edwards initially contended that a series of false reports (five in total) were made to DFACS, to include one report of lemon juice, one report of popcorn and vinegar, one report of mashed potatoes and frozen butter, one report of educational neglect, and one report that Mrs. Edwards suffered from Munchausen Syndrome by Proxy. (Th. Edwards Dep. at 278-80.) As the record bears out, only one report was made to DFACS, but Ms. Miller would supplement the report with additional information when necessary during the investigation (e.g., the report of Kayla being fed a frozen stick of butter). (Miller Dep. at 38-39 & Ex. 1.)

[23] Ms. Miller would later interview Mr. Edwards by telephone. (Miller Dep. at 67-68; H. Edwards Dep. at 68, 72-74.)

her that vinegar and lemon juice would not harm Kayla and that Kayla liked to feel pressure such as a weighted blanket. (Id. at 26-28.)

In the weeks to follow, Ms. Miller met with Dr. Susan Carter, who explained in more detail some of Kayla's sensory integration issues. (Id. at 32-33 & Ex. 1.) She also spoke with Dr. Whitley. The two discussed the disease of Munchausen Syndrome by Proxy, although Ms. Miller does not recall why. (Id. at 31-32.) Ms. Miller testified that no one at HES had reported Mrs. Edwards for Munchuasen Syndrome by Proxy.[24] (Id. at 55-56.)

Other than the initial home visit, Ms. Miller testified that she never again visited the Edwards home. Contrarily, Mrs. Edwards testified that Ms. Miller came to the home the first time with her supervisor, Ms. Crawford. (Th. Edwards Dep. at 308.) She further claims that Ms. Miller, Ms. Crawford and two other unidentified DFACS workers showed up at her home on several more occasions, each time wanting to interview another child. (Id. at 60-62, 307-08.) Mrs. Edwards testified that Ms. Miller and an unknown male visited on one occasion to interview Malek and Nohemi while she was not present in the room. (Id. at 313-14.) She added that Ms.

_____

[24] Indeed, two of the third-party witnesses questioned about the charge of Munchausen Syndrome by Proxy testified that it was Mrs. Edwards who had brought it up to them. (Godbee Dep. at 42-43; McClam Dep. at 37; see also H. Edwards Dep. at 68-69.)

Miller and an unknown female visited again in an attempt to interview Lillian, Briana, and Kayla. (Id. at 317-19.) Mrs. Edwards stated that Ms. Miller came to her home six times altogether. (Id. at 322.) Only one home visit, on October 30, 2003, is noted in Ms. Miller's investigation summary. (See Miller Dep. Ex. 1 - Child Protective Services Investigative Conclusion.)

On January 16, 2004, the DFACS investigation was closed; Ms. Miller had determined that the school's suspicion of child abuse/neglect was unsubstantiated, i.e. there was no evidence to support such a finding. (Id. at 17 & Ex. 1 - Child Protective Services Investigative Conclusion.)

Defendants state that the truancy report and the DFACS report were filed in good faith. Further, Defendants maintain that Ms. Warren could have been subject to criminal prosecution and the loss of her teaching certificate had she not reported the information to DFACS. She was also compelled by School Board policy to submit the truancy report. Plaintiffs contend that these reports were made in bad faith, without objective evidence of reasonable cause, and in retaliation for Plaintiffs' complaints about the treatment of children in the special education class.

## D. PLAINTIFFS HARVEY AND THERESA EDWARDS' CLAIMS ARISING OUT OF THEIR ALLEGATIONS OF RETALIATION AND CONSPIRACY

Based upon the timing of the reports to DFACS, that is, in relation to Mrs. Edwards' letters of complaint to School Board officials about abuse, the Edwards claim that Defendants retaliated against them by filing false reports.[25] Indeed, the Edwards' claims are based upon an alleged conspiracy between the school officials of HES, the Board's Special Education administration, the Board's central administrative team, and members of the DFACS office.

In summary, Plaintiffs assert state law claims of intentional infliction of emotional distress (Count 5), conspiracy to intentionally inflict emotional distress (Count 6), false imprisonment (Count 7), invasion of privacy (Count 11), and slander (Court 12). Plaintiffs also assert several claims pursuant to 42 U.S.C. § 1983 for the deprivation of their constitutional rights under the First, Fourth, and Fourteenth Amendments (Counts 14-21).

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is

---

[25] To the extent that Plaintiffs allege that part of Defendants' retaliation was based upon Mrs. Edwards' criticism of Kayla's non-placement in the autism program, such allegations would be subject to the IDEA's exhaustion requirement, in accordance with M.T.V. v. DeKalb County School Dist., 446 F.3d 1153 (11th Cir. 2006). Accordingly, allegations of this nature will not be considered as bases for any retaliation claim.

entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In making this determination, the Court "view[s] the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve[s] all reasonable doubts about the facts in favor of the non-movant." Kingsland v. City of Miami, 382 F.3d 1220, 1226 (11th Cir. 2004).

The Supreme Court has construed Rule 56(c) to "mandate the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The Court explained that, "[i]n such situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." Id. at 323; see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). The non-moving party must demonstrate that there are specific facts that would create a genuine issue for trial. See Anderson, 477 U.S. at 250. The non-moving party cannot "rest upon the mere allegations or denials in its pleadings. Rather, its responses . . . must set forth specific facts showing that there is a genuine issue for trial." Walker v.

Darby, 911 F.2d 1573, 1576-77 (11th Cir. 1990). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," disposition by summary judgment is appropriate. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

### III.  LEGAL ANALYSIS

Plaintiffs assert both state law and federal claims in this case. With respect to Plaintiffs' federal claims, Defendants assert that they are entitled to qualified immunity and that Plaintiffs have failed to state a claim against them. With respect to Plaintiffs' state law claims, Defendants assert the defenses of sovereign immunity and official immunity.

The Court will first address the implication upon Plaintiffs' claims of an Eleventh Circuit decision rendered after Defendants' motion for summary judgment had been fully briefed by the parties - specifically, the case of M.T.V. v. DeKalb County Sch. Dist., 446 F.3d 1153 (11th Cir. 2006). Thereafter, Plaintiffs' abuse-related federal claims will be discussed, followed by a separate discussion of Plaintiffs Harvey and Theresa Edwards' federal claims involving allegations of retaliation and conspiracy.

## A.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

The IDEA ensures that "all children with disabilities have available to them a free appropriate public education" ("FAPE").  20 U.S.C. § 1400(d)(1)(A).  Before a plaintiff can bring a claim in federal court for an IDEA violation, however, he must exhaust his administrative remedies.  Id. § 1415(l).

In M.T.V. v. DeKalb County Sch. Dist., 446 F.3d 1153 (11th Cir. 2006) (hereinafter the "M.T.V. case"), the Eleventh Circuit expanded the IDEA's administrative exhaustion requirement by holding that retaliation claims under 42 U.S.C. § 1983 must be exhausted.[26]  The parties in the case at bar were thus asked to brief the impact of the M.T.V. case upon Plaintiffs' remaining claims.

Defendants responded by arguing that all of Plaintiffs' federal claims should be dismissed for failure to exhaust administrative remedies under the IDEA because all of Plaintiffs' claims arise out of the alleged mistreatment of children placed in a special education class.

In the M.T.V. case, the § 1983 retaliation claim at issue

_____

[26] The exhaustion requirement for claims asserted under federal civil rights statutes was by no means a new concept in federal jurisprudence.  See, e.g., Fitzpatrick v. Town of Falmouth, 324 F. Supp. 2d 95 (D. Me. 2004) (citing Rose v. Yew, 214 F.3d 206 (1st Cir. 2000); Covington v. Knox County Sch. Sys., 205 F.3d 912 (6th Cir. 2000).  Indeed, in Babicz v. School Bd. of Broward County, 135 F.3d 1420 (11th Cir. 1998), the Eleventh Circuit held that the IDEA's exhaustion requirement applies to IDEA-based claims brought pursuant to § 1983.  The M.T.V. case, however, went a step further in requiring exhaustion for a constitutional claim under § 1983, namely a First Amendment claim of retaliation.

involved allegations that the school district and others retaliated against the parents of a disabled student, M.T.V., "for asserting M.T.V.'s rights under the IDEA." Id. at 1157. The plaintiffs alleged that the school district began "'a long history of ongoing retaliation, coercion, intimidation, [and] threats.'" Id. at 1155 (quoted in the original). Such retaliation included harassment at IEP meetings, sending intimidating letters, and subjecting M.T.V. to needless and intrusive testing. The Eleventh Circuit found that the plaintiffs' claims clearly related to M.T.V.'s evaluation and education, and thus were subject to the IDEA's exhaustion requirement. Id. at 1158.

In the instant case, part of Plaintiffs' initial claims were no doubt related to Kayla and Jessica's special education evaluation and placement. Indeed, the complaint included a claim of discrimination under Title VI, 42 U.S.C. § 2000d et seq., based upon the School Board's alleged withholding of certain autism testing procedures. This claim has been dismissed. And, to a certain extent, Plaintiffs Theresa and Harvey Edwards' claims of retaliation included allegations that Defendants reported Theresa Edwards to DFACS based in part upon her complaints concerning the failure to identify and treat Kayla as autistic.

Nevertheless, Plaintiffs' claims regarding physical and mental abuse have nothing to do with the rights and

protections of the IDEA other than the incidental fact that the allegedly abused children happen to be in a special education classroom. Further, claims that Theresa Edwards was turned into DFACS based upon her complaints concerning this alleged abuse are unrelated to the IDEA. In other words, had the alleged abuse been perpetrated on two regular education kindergartners, the exhaustion requirement would not be an issue. It would take an overly broad reading of the M.T.V. case to require Plaintiffs to exhaust administrative remedies for their claims of abuse and retaliation based upon their complaints of the abuse.

This conclusion is supported by the Eleventh Circuit's most recent discussion of this issue in J.P. v. Cherokee County Bd. of Educ., 2007 WL 582418 (11th Cir., Feb. 27, 2007). In that case, the court affirmed the dismissal of all of the plaintiffs' claims, including § 1983 claims, "for monetary damages resulting from physical, emotional, and educational injuries" suffered by a disabled student. Id. at *1. The court does not set forth the relevant facts in great detail, but the import of those facts is unmistakable. The court quoted the district court's conclusion that the litigation "'[a]t its heart, . . . is about a failure to sufficiently provide a [FAPE] to [J.P.] and the adverse educational consequences of that failure.'" Id. at *2. In affirming this conclusion, the Eleventh Circuit held that "because J.P.'s

alleged injuries *primarily* relate to the provision of his FAPE, and thus constitute educational injuries (as opposed to physical injuries), Plaintiffs were required to exhaust administrative remedies before filing this court action." Id. (emphasis in original). The remaining claims in the instant case, on the other hand, are primarily related to physical and mental injuries which are wholly unrelated to the provision of an FAPE to the children. In the words of the IDEA's remedies provision, the claims are unrelated to "the identification, evaluation, or educational placement of the child, or provision of a [FAPE] to such child." See 20 U.S.C. § 1415(b)(6), quoted in M.T.V., 446 F.3d at 1157. Accordingly, Plaintiffs were not required to exhaust administrative remedies on the claims addressed in this Order.

## B.    ABUSE-RELATED CLAIMS

Plaintiffs' federal claims are asserted pursuant to 42 U.S.C. § 1983. Section 1983 creates a federal remedy for deprivations of federal rights. Wideman v. Shallowford Community Hosp., Inc., 826 F.2d 1030, 1032 (11th Cir. 1987). An actionable § 1983 claim requires proof of a deprivation of rights, privileges or immunities secured by the Constitution and laws of the United States and that the deprivation was by

a person or persons acting under color of law.[27] Id.

On behalf of Kayla and Jessica, Plaintiffs assert that their Fourteenth Amendment right to be free from "unreasonable, arbitrary, and capricious disciplinary action" was violated by the alleged mental and physical abuse. (Counts 13 and 28.) Also, they assert that such abuse amounted to a violation of the Due Process Clause of the Fourteenth Amendment. (Counts 20 and 29.)

As a preliminary matter, there is no right to be free from unreasonable, arbitrary, and capricious disciplinary action in the plain text of the Fourteenth Amendment. Rather, the Fourteenth Amendment provides that no State "shall deprive any person of life, liberty, or property, without due process of law . . . . " U.S. Const. amend. XIV, § 1. In the context of a school setting, Plaintiffs' allegations regarding the alleged abuse implicate a student's fundamental liberty interest in her "bodily integrity," as protected by the Due Process Clause of the Fourteenth Amendment. See Hackett v. Fulton County Sch. Dist., 238 F. Supp. 2d 1330, 1353 (N.D. Ga. 2002) (explaining that several federal courts recognize "a 'liberty interest' by a student in his 'bodily integrity,' such that when a state actor, such as a public school teacher, violates that 'bodily integrity,' a claim under the Fourteenth

_____

[27] There is no dispute that Defendants acted under color of state law at all times relevant to the case.

34

Amendment arises" (cited sources omitted)); see also Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 451 (5th Cir. 1994) (recognizing a liberty interest under the substantive due process component of the Fourteenth Amendment for a minor student who had consensual sexual intercourse with her teacher). Consequently, Plaintiffs' claims under Counts 13 and 28 and under Counts 20 and 29 are essentially duplicative. In either circumstance, the alleged abuse or so-called discipline of Kayla and Jessica at the hands of their teachers implicates their due process right to be free from bodily harm.[28]

Because Plaintiffs have asserted their substantive due process claims against Defendants in their individual capacities, the claims must be examined in the context of Defendants' raised defense of qualified immunity. Qualified immunity shields government officials from suit when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In Saucier v. Katz, 533 U.S. 194, 201 (2001), the Supreme Court set out a two step analysis to determine whether an officer is

---

[28] In J.A. ex rel. Abelove v. Seminole County Sch. Bd., 2005 WL 3093407 (M.D. Fla., Nov. 18, 2005), the district court expressly noted that whether the conduct complained of constituted excessive corporal punishment or fell under the rubric of "abuse," the "shock the conscience" analysis of a Fourteenth Amendment violation would be the same. Id. at *4 n.9.

35

eligible for qualified immunity. The first step is to determine whether the facts alleged would establish that the defendant's conduct violated a constitutional or statutory right. <u>Id.</u> If the conduct did not violate a constitutional right, the inquiry ends there. If the conduct violated a constitutional right, a court must move on to the second step and determine "whether the right was clearly established." <u>Id.</u>

"In making a qualified immunity determination, [the Court is] obliged to review the facts in the light most favorable to the plaintiff." <u>Skop v. City of Atlanta, Ga.</u>, 485 F.3d 1130, 1136 (11th Cir. 2007) (citing <u>Saucier</u>, 533 U.S. at 201)). Thus, in conducting a qualified immunity analysis, the Court must assume "the plaintiff's best case" and resolve any factual disputes in the plaintiff's favor. <u>Robinson v. Arruqueta</u>, 415 F.3d 1252, 1257 (11th Cir. 2005).

   1.   <u>Individual Liability of Defendants Towns and Williams</u>.

In this case, Plaintiffs allege that the mental and physical abuse of Kayla and Jessica deprived them of a protected liberty interest. The United States Supreme Court has emphasized that the substantive due process clause is violated only when state conduct "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." <u>County of Sacramento v. Lewis</u>, 523

U.S. 833, 847 (1998); see also Nix v. Franklin County Sch. Dist., 311 F.3d 1373, 1377-78 (11th Cir. 2002); White v. Lemacks, 183 F.3d 1253, 1259 (11th Cir. 1999) ("[S]tate and local government officials violate the substantive due process rights of individuals not in custody only when those officials cause harm by engaging in conduct that is arbitrary, or conscience shocking, in a constitutional sense, and that standard is to be narrowly interpreted and applied." (internal citation and quotation omitted)).

To be clear, liability is not imposed whenever a state actor causes harm; instead, such conduct must rise to the conscience-shocking level. County of Sacramento, 523 U.S. at 848-49. Even intentional wrongs or conduct that amounts to an intentional tort under state law, "will rise to the level of a substantive due process violation only if it also shocks the conscience." Waddell v. Hendry County Sheriff's Office, 329 F.3d 1300, 1305 (11th Cir. 2003); see also Dacosta v. Nwachukwa, 304 F.3d 1045, 1048 (11th Cir. 2002) (act defined as intentional tort under state law did not amount to deprivation of constitutional right).

In their complaint, Plaintiffs claim that they were abused in the following manner: (1) the infliction of bruises; (2) the denial of bathroom privileges; and (3) the failure to accommodate the dietary needs of the children. The record

also contains allegations concerning the use of a "jailroom" with both children. Finally, in deposition Mrs. Edwards complains about the school's failure to accommodate Kayla's sensory tactile disorder and failure to provide implements to allay her autistic tendencies, such as the lap belt and "mushing box." Importantly, Plaintiffs concede in brief that any factual allegations related to the "jailroom" or the children's dietary needs do not serve as bases for any cause of action in the complaint. (Pls.' Brf. in Opp'n to Defs.' Mot. for Summ. J., at 46-47.[29]) Accordingly, this Court will not consider any allegations of abuse, aside from the infliction of bruises, the denial of bathroom privileges, and the failure to provide Kayla with a "mushing box," to support claims for deprivation of the children's liberty interests.

Turning now to the relevant allegations of abuse, Defendants correctly point out that there are no eyewitness accounts of Defendants Williams or Towns grabbing, striking or otherwise injuring Kayla or Jessica. The only evidence of

_____

[29] Plaintiffs specifically state as follows: "Plaintiffs have not alleged in their complaint a cause of action for using the time-out room improperly or otherwise, despite the testimony given on the subject." and "Plaintiffs have not alleged in their complaint a cause of action on behalf of Kayla Edwards for school personnel's improper failure to provide food or adhere to certain diets of Kayla, despite the testimony given on the subject. The same is true as to Jessica Burrow's diet, as there is no direct testimony of intentional conduct related to said diets and/or lack of compliance therewith." (Pls.' Brf. in Opp'n to Defs.' Mot. for Summ. J., at 46-47.) These claims are therefore deemed abandoned. McMaster v. United States, 177 F.3d 936, 940-41 (11th Cir. 1999) (claim may be considered abandoned when district court is presented with no argument concerning a claim included in the plaintiff's complaint).

physical abuse is the occasional existence of unexplained bruises on the children's arms. Only the statements of Kayla and Jessica to adults (namely their family members) link those bruises to a teacher. Defendants argue that the hearsay statements of two five-year-old autistic children is not sufficient to overcome summary judgment.[30] Indeed, Defendants spend much of their time discrediting the testimony of the family members about what they did or did not witness or hear from the children. With respect to the bruises, Defendants explain that they could have occurred as a result of playground accidents, could have been inflicted by another child, or caused by some other event. By their very arguments, however, Defendants ask this Court to weigh the evidence and to assess credibility, something the Court must not do at this juncture. Furthermore, there is other evidence in the record that corroborates Plaintiffs' version of events. Namely, Ms. Leeann Zrakovi, Asha Houston's mother, averred that her child also had unexplained bruises. Also, disinterested witnesses, Ms. Tracy McClam and Ms. Holly Hadden, testified that they saw bruises on Kayla and Jessica, respectively, and heard them exclaim that the teacher or Ms. Towns had hurt them.

---

[30] "The parents' statements about what their children told them are hearsay, but are excepted as present sense impressions under Rule 803(1) or as statements expressing then-existing mental, emotional, or physical condition under Rule 803(3)." <u>United States v. Baker</u>, 432 F.3d 1189, 1214 (11th 2005).

Moreover, there is sufficient evidence in the record to indicate that both Ms. Williams and Ms. Towns denied the children bathroom privileges. The record contains testimony from Mr. Edwards, Mrs. Edwards, and Mrs. Burrow that they witnessed the teachers deny the children permission to go to the bathroom. This evidence, coupled with the testimony of a non-party witness, Ms. Zrakovi, that her child repeatedly came home wet or soiled, supports an inference that the teachers denied bathroom privileges to the discomfort and embarrassment of the children.

The issue now is whether the conduct of inflicting bruises, multiple incidents of denying bathroom privileges, and failing to provide to Kayla a "mushing box" shocks the conscience pursuant to Eleventh Circuit precedent. The trial judge's personal view of the alleged behavior is neither controlling nor relevant.

One of the leading cases in the Eleventh Circuit that discusses the "shock the conscience" standard in a school setting is Nix v. Franklin County Sch. Dist., 311 F.3d 1373 (11th Cir. 2002). That § 1983 case involved a high school student's death from electrical shock during a voltage-reading demonstration in his electromechanical class. In affirming the grant of summary judgment against the plaintiffs, the Eleventh Circuit warned that courts must avoid encroaching substantive due process into the conventional tort field. Id.

at 1376. The Nix court emphasized that mere negligence is not sufficient to sustain a constitutional claim; however, actions that intend to injure and that are unrelated to any governmental interest are most likely to rise to the conscience-shocking level. Id. "Acts that fall between the poles of negligence and malign intent require courts to make 'closer calls' . . . ." Id. (quoted source omitted). The court recognized a culpability spectrum upon which a case must be placed to determine whether it falls within the purview of constitutional protection. Id. at 1376-77. The Nix court used other cases in school settings to illustrate the culpability spectrum. Id. at 1378.

At one end of the spectrum is the case of Dacosta v. Nwachukwa, 304 F.3d 1045 (11th Cir. 2002). In Dacosta, a college student, Melanie Dacosta, brought a § 1983 claim against her instructor. In the case, the instructor ignored a question asked by Dacosta in class. When Dacosta asked again, the instructor failed to answer again and walked out of the classroom. When Dacosta followed the instructor out of the classroom, the instructor darted back inside and slammed the classroom door in Dacosta's face to deny her reentry. Dacosta held up an arm to protect herself from the door, but her arm shattered the glass window of the door and became lodged in the glass pane. The instructor violently swung the door several times to knock Dacosta back from the door but was

41

unsuccessful. Then, the instructor reached through the cracked glass pane and shoved Dacosta's face, trying to forcibly dislodge her arm from the door. The instructor had to be restrained by other students until the police arrived. Id. at 1047. The Eleventh Circuit held that Dacosta had alleged no more than the tort of battery and that such allegations did not reach constitutional proportions. Id. at 1049.

On the other end of the spectrum is Neal v. Fulton County Bd. of Educ., 229 F.3d 1069 (11th Cir. 2000), in which the Eleventh Circuit held that a plaintiff had sufficiently alleged a due process claim. In Neal a high school coach struck a fourteen-year-old boy with a weight lock. The force of the blow knocked the boy's left eye "completely out of its socket," leaving the eye "hanging out of his head." The boy was permanently blinded in his left eye as a result. Id. at 1071. The Neal court expressly considered the fact that this act was perpetrated as an attempt to punish the student's behavior, such that the case involved a claim of excessive corporal punishment. Id. at 1074-75. The court reasoned that where the exercise of corporal punishment is "'so brutal, demeaning and harmful as literally to shock the conscience of the court,'" it is actionable under the substantive due process clause. Id. at 1075 (quoting Hall v. Tawney, 621 F.2d 607, 613 (4th Cir. 1980)).

42

In further assessing the culpability spectrum for the "shock the conscience" standard, the Court has reviewed the decisions of other circuits though they are not binding. In doing so, it is clear that the level that conduct must reach to shock the conscience is truly an egregious one. For instance, the following circumstances did not sustain a substantive due process claim: a teacher forcefully slapped a student's face causing severe physical pain and emotional trauma, <u>Smith v. Half Hollow Hills Cent. Sch. Dist.</u>, 298 F.3d 168 (2d Cir. 2002); a principal "pushed [a student's] shoulder with his hand, propelling her backwards into a door jamb," causing serious injury, <u>Gottlieb v. Laurel Highlands Sch. Dist.</u>, 272 F.3d 168 (3d Cir. 2001); a teacher struck a student in the chest causing bruising and anxiety, <u>Kurilla v. Callahan</u>, 68 F. Supp. 2d 556 (M.D. Pa. 1999); a teacher in anger grabbed a disruptive student by the arm and pulled him across the desk causing the student to fall against a bulletin board and then onto the floor, sustaining several bruises, <u>Jones v. Witinski</u>, 931 F. Supp. 364 (M.D. Pa. 1996); a teacher pierced a student's arm with a straight pin, <u>Brooks v. School Bd. of City of Richmond</u>, 569 F. Supp. 1534 (E.D. Va. 1983); <u>see also</u> <u>Brown v. Ramsey</u>, 121 F. Supp. 2d 911 (E.D. Va. 2000) (collecting cases where summary judgment was appropriate notwithstanding actual, minor physical injury such as bruises).

More illustrative are cases in which the conduct rises to the conscience-shocking level: a teacher lifts a student off the ground by the neck, chokes and drags him across the floor, punches his face, and slams his head into bleachers and a metal fuse box, Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246 (2d Cir. 2001); a teacher sexually abused a fifteen-year-old student, Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443 (5th Cir. 1994); a teacher placed a student in a choke-hold, applying enough pressure that the student passed out, fell to the floor, lacerated his lower lip, and fractured his teeth and nose, Metzger v. Osbeck, 841 F.2d 518, 519 (3d Cir. 1988); a teacher lashed a second-grade student to a chair for the better part of two school days, Jefferson v. Ysleta Indep. Sch. Dist., 817 F.2d 303 (5th Cir. 1987); a teacher administered two beatings to a nine-year-old girl - one in which the girl was held up by her ankles and hit with a split board on the front of her legs until they bled and another in which the girl was administered a spanking so severe that it caused severe bruises and pain for several weeks, Garcia v. Miera, 817 F.2d 650, 658 (10th Cir. 1987); a teacher paddled, shoved and violently struggled with a grade school student who required ten days hospitalization for extensive soft tissue injuries and possible spinal injuries, Hall v. Tawney, 621 F.2d 607.

Clearly, the threshold for establishing a constitutional

tort in a school setting is a high one indeed. In considering the facts of the instant case in light of this high standard, particularly considering the <u>DaCosta</u> decision, the Court is constrained to conclude that the alleged abuse occasioned upon Kayla and Jessica does not "shock the conscience" as that term is defined by Eleventh Circuit case law. That is not to say that the Court condones such alleged abuse or does not look upon such alleged conduct with abject disfavor. Rather, the imposition of minor bruises on the children's arms, even if indefensible, is not egregious enough to implicate the due process clause. If the facts are as alleged by Plaintiffs, their claims may be actionable as state tort claims but are not actionable as constitutional torts.

The Court is compelled to mention that the tender age of the children and their special needs status were considered and mitigate in favor of a finding that their alleged mistreatment shocks the conscience. Nevertheless, the Court remains mindful of the Eleventh Circuit's admonition "to remain vigilant in policing the boundaries separating tort law from constitutional law." <u>Nix</u>, 311 F.3d at 1378. "[T]he Fourteenth Amendment is not a 'font of tort law' that can be used, through section 1983, to convert state tort claims into federal causes of action." <u>Neal</u>, 229 F.3d at 1074 (quotes in the original) (cited sources omitted). In short, Plaintiffs have not established a constitutional violation of the

children's rights, and therefore, Defendants Williams and Towns are shielded by qualified immunity. Accordingly, Defendants Williams and Towns are entitled to summary judgment on Counts 13 and 28 and Counts 20 and 29.

2.    Liability of the Remaining Defendants.

Plaintiffs' claims against Defendants Warren, Duncan, and the School Board involve allegations that they had an affirmative duty to protect Kayla and Jessica from the abuse perpetrated by Defendants Williams and Towns. Further, Plaintiffs allege that these Defendants were deliberately indifferent to their rights when they failed to investigate and prevent the abuse.

It is well-settled law that § 1983 does not provide for liability via respondeat superior. See Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978); Denno v. Sch. Bd. of Volusia County, 218 F.3d 1267, 1277 (11th Cir. 2000). Accordingly, with respect to Defendants Warren and Duncan, Plaintiffs must prove a causal connection between their conduct and the constitutional deprivations alleged by Plaintiffs. See Braddy v. Florida Dep't of Labor & Employment Sec., 133 F.3d 797, 801 (11th Cir. 1998). With respect to the School Board, Plaintiffs must show that a constitutional violation occurred as a result of a municipal "policy" or "custom" which caused the deprivation of federal rights. See Davis v. DeKalb Co. School Dist., 233 F.3d 1367, 1375-76 (11th Cir. 2004). Here, because

there was no underlying constitutional violation of Kayla and Jessica's rights, there can be no cause of action under § 1983 against any of these remaining Defendants. Accordingly, these Defendants are also entitled to summary judgment on Counts 13 and 28 and Counts 20 and 29.


**B.     RETALIATION AND CONSPIRACY CLAIMS**

On their own behalf, Plaintiffs Harvey and Theresa Edwards assert several § 1983 claims arising from their allegations that Defendants conspired to retaliate against them for their complaints about the perceived abuse in Ms. Williams' classroom. Specifically, Plaintiffs claim that under the Fourteenth Amendment, they have a protected liberty interest in the preservation of their reputation (Count 14), a right of family association (Count 16), and a right to be free from arbitrary state action (Count 18), all of which were violated through the filing of the allegedly false reports. They assert that such conduct violated their substantive due process rights as well (Count 21). Also, they assert that their First Amendment right to be free of retaliation for the exercise of free speech (Count 15) and their Fourth Amendment right to be free of illegal searches and seizures (Count 17) were violated by the false DFACS reports and subsequent DFACS investigation. Finally, Plaintiffs assert a deliberate indifference claim against the School Board in Count 19.

Through their summary judgment motion, Defendants contend that Plaintiffs have failed to state a claim upon which relief may be granted under § 1983 no matter the constitutional vehicle Plaintiffs choose.

1.  <u>The Claims.</u>

To analyze Plaintiffs' § 1983 claims, a closer look at the claims is necessary.  The claims may be summarized as follows:

<u>Count 14</u>: Plaintiffs allege that Defendants' decision "to intentionally and maliciously subject [them] to ridicule, unwarranted and unsubstantiated investigation without cause" deprived them of a protected liberty interest in the preservation of their reputation under the Fourteenth Amendment.  (Compl. ¶¶ 145-46.)  Plaintiffs further allege that the School Board "refused to intervene and/or sponsored and/or condoned the use of these tactics against [them]." (<u>Id.</u> ¶ 147.)

<u>Count 15</u>: Plaintiffs allege that Defendants and known and unknown co-conspirators "became upset at the public criticism/complaints of abuse" made by them, and thus they retaliated against them in violation of their freedom of speech under the First Amendment and the equal protection clause of the Fourteenth Amendment.  (<u>Id.</u> ¶¶ 150-51.)  More specifically, Plaintiffs allege that "Defendants reached an agreement and entered into a conspiracy, the object of which

48

was to discharge silence (sic) said criticism and complaints and to retaliate against [them] . . . ." (Id. ¶ 152.) In furtherance of this conspiracy, Defendants allegedly had conversations pertaining to the retaliation and filed numerous false reports. (Id. ¶¶ 153-54.)

Count 16: Plaintiffs allege that Defendant Warren "wrongfully, willfully and maliciously instituted child abuse investigations" against them and that such unwarranted investigations violated their Fourteenth Amendment right to family association.[31] (Id. ¶¶ 159-64.)

Count 17: Plaintiffs allege that because of the false reports of child abuse, they were seized and otherwise detained on six or more occasions for questioning by DFACS. Thus, Defendants' false reports caused Plaintiffs' Fourth Amendment rights to be violated.[32] (Id. ¶¶ 166-68.)

Count 18: Plaintiffs allege that their "right to be free from arbitrary state action" under the Fourteenth Amendment was violated. (Id. ¶ 171.)

Count 19: Plaintiffs allege that the School Board "was deliberately indifferent in training individual Defendants in proper and lawful techniques of child abuse investigations and

---

[31] Notably, Plaintiffs have not sued DFACS. Instead, Plaintiffs' allegations are based on their belief that Defendants intentionally put the DFACS investigative wheels in motion, knowing that their constitutional rights would be violated.

[32] See note 34 supra.

reporting by its lack of policy and procedures for the same,"
which caused the violation of their constitutional rights.
(Id. ¶¶ 174-75.)

Count 21: Plaintiffs allege that Defendants' "acts of
willfully and maliciously reporting [] falsehoods to
governmental agencies such as DFCS (sic), with knowledge of
the falsity of each complaint" violated their substantive due
process rights. (Id. ¶ 181.) Further, Plaintiffs allege that
the School Board failed to adequately intervene, investigate
or train school personnel regarding the proper use of the
DFACS complaint process. (Id. ¶ 182.)

In reading these allegations, it is clear that each and
every § 1983 claim arises out of Plaintiffs' contention that
the truancy report and the DFACS report were false and filed
solely to harass and retaliate against them. Thus, if
Plaintiffs cannot produce sufficient evidence to support this
contention, all of their § 1983 claims related to conspiracy
and retaliation fail as a matter of law.

2.    No False Reports.

It is undisputed that Ms. Warren was under an obligation
imposed by a School Board policy to file a report when a
student accrued over 5 absences, whether such absences were
excused or unexcused. Plaintiffs do not dispute that Kayla
had accrued nine absences, nor do they dispute that Ms. Warren
had an obligation to file the report. Moreover, there is no

evidence that Ms. Warren treated Kayla's absences in any manner different than any other child's. Finally, there is no evidence that the truancy report was filed in retaliation against the Edwards family. Indeed, according to Mrs. Edwards, the conspiracy to retaliate against her family was hatched after the October 21, 2003 autism eligibility meeting. Because the truancy report was filed over a month earlier, there can be no causal relationship between the truancy report and any alleged conspiracy. Accordingly, as a matter of law, Plaintiffs are unable to create a genuine issue of material fact regarding whether their constitutional rights were violated by the filing of this mandatory report. The Court therefore will not consider the truancy report as a basis for any § 1983 claim.

With respect to the DFACS report, there is no evidence that the allegations made by Ms. Warren were false. The initial intake form shows that Ms. Warren reported the following:

> Reporter [Ms. Warren] states that Ms. Edwards would feed the child vinegar, straight lemon juice and popcorn. Reporter states that Ms. Edwards would lay on Kayla and squeeze her stating that she did that to help her sleep.

> Reporter states that Ms. Edwards is trying to keep Kayla in the special ed. class by reporting that she is doing things that the school staff has not observed. Reporter states that Ms. Edwards is also giving Kayla some UKN medication and she will not allow the school nurse to administer the medication or disclose what kind of medicine it is.

(Miller Dep., Ex. 1 - Ga. Dep't of Human Resources Child Abuse/Neglect Intake Worksheet.) It is undisputed that Defendants stayed after the October 21, 2003, autism eligibility meeting to discuss these very items among others such as the harsh administration of medication to Kayla that evening. The only part of this report that Mrs. Edwards denied as true is that she gave Kayla vinegar. Mrs. Edwards admitted that she fed Kayla popcorn and lemon juice. She admitted that she lay on top of Kayla. (Th. Edwards Dep. at 253-54.) She admitted that she refused to allow the school staff to administer medication. She admitted that she did not believe that Kayla had the abilities that the school staff observed Kayla to have. (See id. at 538-39.) Indisputably, the evidence establishes that Defendants were concerned about Mrs. Edwards' conduct toward Kayla in certain respects, and there is no evidence that these concerns were unwarranted or unfounded. Accordingly, the DFACS report was not false, viewing the evidence in a light most favorable to Mrs. Edwards.

    3. <u>No Conspiracy to Retaliate.</u>

To establish a prima facie case of § 1983 conspiracy, Plaintiffs must show, among other things, that Defendants "reached an understanding to violate [their] rights." <u>Rowe v. City of Fort Lauderdale</u>, 279 F.3d 1271, 1283 (11th Cir. 2002) (quoted source omitted). Thus, there must be evidence of an

agreement between Defendants. <u>See id.</u> For a conspiracy claim
to survive a motion for summary judgment, a mere scintilla of
evidence will not suffice. <u>Id.</u> at 1284 (citing <u>Walker v.
Darby</u>, 911 F.2d 1573, 1577 (11th Cir. 1990)). Merely
"string[ing] together" adverse acts of individuals is
insufficient to demonstrate the existence of a conspiracy.
<u>Harvey v. Harvey</u>, 949 F.2d 1127, 1133 (11th Cir. 1992).

In this case, Plaintiffs claim that Defendants, all of
whom stayed after the October 21st meeting, conspired or agreed
to file the DFACS report to retaliate against Mrs. Edwards for
her prior complaints of abuse. Mrs. Edwards' testimony to
that effect is pure speculation however.

First, each individual defendant specifically disavows
being involved in any conspiracy involving the Edwards family.
(Williams Aff. ¶ 8; Towns Aff. ¶ 8; Warren Aff. ¶ 6; Duncan
Dep. at 64.) There are no third-party witnesses to support
Mrs. Edwards' conspiracy theory. In particular, Mrs. Edwards
claimed in deposition that Ms. Melinda Lazenby, Ms. Holly
Hadden, and Ms. Dottie Edmondson told her that Defendants
discussed filing a DFACS report to get even with Mrs. Edwards
for filing complaints of abuse following the October 21st
meeting.[33] Neither Ms. Hadden nor Ms. Edmondson attended the

_____

[33] The deposition testimony reads as follows:

Q. You said that Melinda Lazenby was, quote, "involved in
planning the DFCS (sic) reports." What do you mean by
that?

October 21st meeting (Hadden Dep. at 34-35; Edmondson Dep. at 34), and both expressly disavow any knowledge of a conspiracy. (Hadden Aff. ¶¶ 3-4; Edmondson Dep. at 33-37). Ms. Lazenby testified that she was not even aware that anyone stayed after the meeting to discuss Mrs. Edwards. (Lazenby Dep. at 26.)

Second, Plaintiffs make much of the fact that the DFACS report was made on the same day that Mrs. Edwards confronted Ms. Warren at school and the same day that Mrs. Edwards sent a letter of complaint to School Board member Missoura Ashe.

---

A. She told us that she was in the meeting, that it was planned -- they had made a decision and discussed and planned it after the October IEP meeting in which Dr. Duncan had decided to have a hand vote on whether or not Kayla was or was not autistic. At this point I was already filing complaints over the abuse that was going on in that school.

Q. Are you saying that Melinda Lazenby was present at a meeting that took place after the October '03 meeting in which there was a conspiracy to file DFCS (sic) complaints against you?

A. Yes, sir. It went on the very same day as soon as I left the IEP meeting.

Q. And all the people, to the best of your knowledge, that were present for the IEP meeting in October of '03, except for you, participated in this post IEP meeting in which this conspiracy was discussed to file the false DFCS (sic) reports?

A. Yes, sir.

Q. And tell me everyone who has ever told you that such a meeting took place, anybody other than Melinda Lazenby.

A. Holly Hadden. And then I have Dottie Edm[o]ndson who told me that they had planned on doing this, that she also knew of other instances where they had done things like this, but they just never had gone to this degree.

(Th. Edwards Dep. at 133-34.)

The undisputed evidence, however, shows that Ms. Warren first contacted DFACS two days prior to the day she filed the report. Accordingly, Ms. Warren could not have acted in retaliation for complaints that Mrs. Edwards had not yet made.

Third, Plaintiffs contend that every time Mrs. Edwards lodged a complaint against the school in some manner, Defendants filed a DFACS report. The undisputed evidence shows, however, that Defendants, in particular Ms. Warren, did not file several reports. Instead, she filed only the initial report. The DFACS record was then supplemented by Ms. Tonia Miller, a DFACS employee, during her investigation. These added allegations included concerns raised by Ms. Williams during a meeting with Ms. Miller about Mrs. Edwards feeding a stick of butter to Kayla and Mrs. Edwards home-schooling Kayla. Despite Mrs. Edwards' protestations to the contrary, there is no evidence that any defendant or school board member filed a report that Mrs. Edwards suffered from Munchausen Syndrome by Proxy.

In short, Plaintiffs have presented only the speculation of Mrs. Edwards as evidence that Defendants reached an agreement to file the DFACS report in retaliation for any complaint of abuse. This scintilla of evidence will not support Plaintiffs' conspiracy claim; no reasonable jury could find that a conspiracy existed in this case.

4.    Conclusion.

Without evidence to support the foundation of Plaintiffs' § 1983 constitutional claims - that Defendants conspired to file false reports in retaliation for Mrs. Edwards' complaints of abuse - all of Plaintiffs' § 1983 claims collapse.    In other words, in the absence of even a scintilla of evidence to support the claim that Defendants filed retaliatory and false reports against the Edwards, Defendants cannot be held liable for a constitutional deprivation of Plaintiffs' rights. Accordingly, Defendants are entitled to summary judgment on Counts 14 through 19 and Count 21.


## IV.    CONCLUSION

Upon the foregoing, Defendants are entitled to summary judgment with respect to all of Plaintiffs' federal claims - specifically, Counts 13 through 21 and 28 through 29.    The remaining claims in this case are Plaintiffs' various  state law claims.    Because jurisdiction over these claims rests solely upon 28 U.S.C. § 1367, the absence of a federal claim places supplemental jurisdiction in doubt.    28 U.S.C. § 1367(c)(3).  Accordingly, Plaintiffs' state law claims (Counts 1-7, 11-12, and 24-27) are **DISMISSED WITHOUT PREJUDICE**.    Id.; see also Crosby v. Paulk, 187 F.3d 1339, 1352 (11th Cir. 1999); Mergens v. Dreyfoos, 166 F.3d 1114, 1119 (11th Cir. 1999).    The Clerk is directed to **CLOSE** the case and **ENTER**

**FINAL JUDGMENT** in favor of Defendants.

     **ORDER ENTERED** at Augusta, Georgia, this _____ 15 _____ day
of August 2007.

HONORABLE LISA GODBEY WOOD
UNITED STATES DISTRICT JUDGE